**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 4 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS TENTH CIRCUIT

LARRY HAGERMAN; CHESTER ALLEN;
RANDAL BAKER; ROBERT BARNEY;
RAYMOND BARTHOLOMEW; RICHARD
BIOCIC; DIXON BLACK; ROD BONNELL;
PAUL BRENNAN; BRIAN BRUNS; STEVE
BUTTERS; LARRY CHOLAS; MARK CLAIR;
JOHN CRAIG; MIKE CROUSE; HAROLD
DAVIS; DARYLL DUNCAN; ALAN ENGER;
KEVIN FURGUSON; JOHN FINLEY; RANDY
FINKBINER; RUBEN FLORES; JAY FULLER;
LEWIS FRASER; DON HAGERMAN; GARY
HALLER; DAN HARTFORD; MICHAEL
HENDERSON; STEVE HICKMAN; JOHN
JOHNSTON; WILLIAM KELLY; RANDY KERR;
LANCE KONCHER; RICH KRUMPOTICH; DON
LENARD; WANDA LOCKE; DAVID
MCINTYRE; MIKE MCGARVEY; KENT
MCDONALD; STEVE MCFARLAND; MICHAEL
MCGUINN; HARRISON MONROE; JESSE
NEEDLES; FRED NELSON; RALPH NIAU; ART
NICOLSON; RICHARD O'CONNER; RICK
OSTLUND; PAUL PETERSON; ALAN
SILLITOE; JOSEPH SCHUMANN; CLINT
SMITH; LAMAR SMITH; CHARLES STEELE;
MARK TITTLE; STEVEN TUCKER; KEN
WATERMAN; JOSEPH WATTS; JEFF
WESTERGARD; MR. WILLOG; ROD WISEMAN;
KURT WILLIAMSON; DAN WILLOUGHBY;
RODNEY WRIGHT; RICK WYRES; KEVIN
BINKLEY; NORM BROWN; MICHAEL D.
COLSON; PAT DALTON; MIKE DUNNING;
LABARON FORCE; RICK GREENER; CHARLES
HARMON; DALE JANNEY; MITCH JOHNSON;

No. 00-1519

A.E. JORDAN; SHELLEY KONCHAR; RICK
MATTHEW; D.W. PACE; KIRK POPISH; W.P.
PRICE; LARRY ROMERO; JOEL STAMATAKIS;
GERRY VIGIL; ERNEST WORSHAM,

     Plaintiffs-Appellants,

v.

UNITED TRANSPORTATION UNION, an
unincorporated labor organization; UNITED
TRANSPORTATION UNION GENERAL
COMMITTEE ADJUSTMENT DENVER RIO
GRANDE WESTERN/SP LINES; UNITED
TRANSPORTATION GENERAL COMMITTEE
ADJUSTMENT EASTERN DISTRICT; UNITED
TRANSPORTATION UNION INTERNATIONAL;
UNITED TRANSPORTATION UNION LOCAL
500; UNION PACIFIC RAILROAD COMPANY;
UNITED STATES DEPARTMENT OF
TRANSPORTATION; THE SURFACE
TRANSPORTATION BOARD; RODNEY E.
SLATER, Secretary of the United States
Department of Transportation; BROTHERHOOD
OF LOCOMOTIVE ENGINEERS;
BROTHERHOOD OF LOCOMOTIVE
ENGINEERS, LOCAL UNION NO. 429;
BROTHERHOOD OF LOCOMOTIVE
ENGINEERS, LOCAL UNION NO. 888;
BROTHERHOOD OF LOCOMOTIVE
ENGINEERS, LOCAL UNION NO. 488;
BROTHERHOOD OF LOCOMOTIVE
ENGINEERS, LOCAL UNION 29; UNITED
TRANSPORTATION UNION, LOCAL 1650;
UNITED TRANSPORTATION UNION, LOCAL
1857,

     Defendants-Appellees.

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 98-M-1384)

Earl K. Madsen of Bradley, Campbell & Madsen, LLP, Golden, Colorado (Steven W. Watkins of Bradley, Campbell & Madsen, LLP, Golden Colorado; Paul X. McMenaman, Evergreen, Colorado; and Robert F. Gauss, Evergreen, Colorado, with him on the brief), for Plaintiffs-Appellants.

Brenda J. Council of Kutak Rock LLP, Omaha, Nebraska, for Defendant-Appellee Union Pacific Railroad Company.

Michael S. Wolly of Zwerdling, Paul, Leibig, Kahn, Thompson & Wolly, P.C., Washington, D.C. (Harold A. Ross of Ross & Kraushaar Co., L.P.A., Cleveland, Ohio; and David B. Kiker of Rossi, Cox, Kiker & Inderwish, Aurora, Colorado, with him on the brief), for Brotherhood of Locomotive Engineers and Local Union No. 429, Local Union No. 888, Local Union No. 488 and Division 29, the Brotherhood of Locomotive Engineers, Defendants-Appellees.

Marilyn R. Levitt, Attorney, Surface Transportation Board, Washington, D.C. (Ellen D. Hanson, General Counsel, and Craig M. Keats, Deputy General Counsel, Surface Transportation Board, Washington, D.C.; Richard T. Spriggs, United States Attorney, and Mark S. Pestal, Assistant U.S. Attorney, Denver, Colorado, with her on the brief), for Federal Defendants-Appellees.

Joseph Guerrieri, Jr., of Guerrieri, Edmond & Clayman, P.C., Washington, D.C., for United Transportation Union and United Transportation Union Locals No. 500, 1857, and 1650, Defendants-Appellees.

Before **SEYMOUR**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **LUCERO**, Circuit Judge.

**SEYMOUR**, Circuit Judge.

Employees and former employees of various railroads filed suit in 1998 against their employers and their unions after their jobs changed in connection with the merger of their employer railroads into one railroad entity. The district court granted summary judgment to defendants, and plaintiffs now appeal. For the reasons stated below, we affirm.

**I**

In 1995, several railroad entities sought to merge under the control of Union Pacific Railroad Company and applied to the Surface Transportation Board (the Board) for approval.[1]  *See* 49 U.S.C. §§ 11323-26. Certain workers at the railroads were represented by the Brotherhood of Locomotive Engineers (BLE) and the United Transportation Union International (UTU). Union Pacific, as the surviving railroad entity, signed "commitment letters" to both unions promising to seek changes in connection with the merger only as necessary to implement it, and not solely to achieve cost savings. In exchange for the letters, both the BLE and the UTU agreed to and did support the merger in the Board proceedings.

---

[1]Railroads seeking to merge or consolidate operations must obtain the approval of the Surface Transportation Board, the successor to the Interstate Commerce Commission. 49 U.S.C. §§ 11323-26. To approve a merger or consolidation, the Board must find that the transaction is in the public interest. 49 U.S.C. § 11324(c). *See also Norfolk & W. Ry. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 132 (1991).

The Board approved the merger on August 6, 1996. *See Union Pac. Corp., Union Pac. R.R., and Missouri Pac. R.R. – Control & Merger – Southern Pac. Rail Corp., Southern Pac. Transp. Co., St. Louis Southwestern Ry., SPCSL Corp., and the Denver and Rio Grande Western R.R.,* Finance Docket No. 32760, Decision No. 44, 1996 WL 467636 (STB Aug. 12, 1996), *aff'd sub nom. Western Coal Traffic League v. STB*, 169 F.3d 775 (D.C. Cir. 1999). In accordance with its statutory obligation to safeguard the interests of railroad employees involved in a Board-approved transaction,[2] *see* 49 U.S.C. § 11326, the Board imposed the New York Dock Conditions as a condition of the merger. *See New York Dock Railway Control Brooklyn Eastern Terminal*, Finance Docket No. 28250 (Feb. 9, 1979) (ICC Order imposing what has now become known as "the New York Dock Conditions"). The conditions require employers to compensate railroad employees displaced by the transaction and provide a process for resolving merger-related employment disputes not covered by collective bargaining agreements. *Id; see also New York Dock Ry. v. United States*, 609 F.2d 83 (2d Cir. 1979) (upholding ICC order).

---

[2]In approving a merger, the Board may exempt the involved carriers from "all antitrust laws and from all other law . . . as necessary to let [those entities] carry out the transaction." 49 U.S.C. § 11321(a). As a limitation on that power, the Board must also establish protective conditions for railroad employees who may be affected by the merger. 49 U.S.C. § 11326. As we discuss in greater detail *infra*, requiring parties to a merger to adhere to the New York Dock Conditions is one way the Board has fulfilled that statutory obligation.

Shortly after the merger was approved, Union Pacific notified both unions that it wanted to make changes to existing seniority districts by implementing hubs in Denver and Salt Lake City and consolidating employees into a single seniority district at each of the hubs. The unions began negotiating implementation agreements with Union Pacific to deal with these changes. The BLE concluded agreements with Union Pacific regarding the proposed changes in February 1997, and its members ratified those agreements on March 31. The UTU could not reach agreement with Union Pacific on the proposed changes and the parties agreed to submit their dispute to arbitration. In its award dated April 14, 1997, the arbitrator accepted Union Pacific's proposed implementation agreements with respect to seniority changes and thereby rejected the UTU's proposal and its corresponding objections to the company's proposals. The UTU appealed the arbitrator's award to the Board, which affirmed with respect to the seniority changes. The UTU or its individual members could have appealed the Board decision to the United States Court of Appeals, but did not. *See* 28 U.S.C. §§ 2321(a), 2342(5); *see also Swonger v. Surface Transportation Bd.*, 265 F.3d 1135 (10th Cir. 2001) (appeal by railroad employees). The time for such appeal has expired.

Although the parties do not agree whether the specific seniority changes contested here were part of the process of merger implementation and review

described above, the nature of the changes themselves is undisputed. Prior to these changes, employees at certain terminals could choose which lines they wanted to work on based on seniority. Some lines were more lucrative and workers with the most seniority generally chose to be assigned to those lines, while workers with less seniority were left to work the less lucrative lines.

This practice changed when Union Pacific implemented its plan to consolidate railway hubs and corresponding seniority districts on July 1, 1997. Under this plan, employees were assigned to new lines based on the old lines they had chosen as of the retrospective dates of November 1, 1996 for UTU members and December 1, 1996 for BLE members. In many cases the new lines were not as desirable as the old lines they replaced. As a result, employees with more seniority were assigned to less desirable lines and employees with less seniority were assigned to more desirable lines. This was the case at the terminals affecting most plaintiffs in this lawsuit: the Grand Junction terminal, with various more- and less-lucrative lines, was reformulated into two new hubs in Salt Lake City and Denver. Employees with more seniority were assigned to the Salt Lake City hub, the less desirable one. These line assignments were "forced" in the sense that the company used a retroactive date to determine which hubs employees would be assigned to rather than allowing workers to choose for

themselves based on seniority.[3]  Employees at terminals in Helper, Utah and Green River, Wyoming were also consolidated into the new hubs and lost certain seniority rights specific to their old terminals as a result.  As mentioned, these seniority changes went into effect on July 1, 1997.

On June 26, 1998, plaintiffs filed this action against the UTU and Union Pacific.  They added the BLE as a defendant on November 18, 1998.  Plaintiffs asserted the following claims that are relevant to this appeal:  breach of contract by Union Pacific; and breach of the duty of fair representation by both the UTU and the BLE.  Plaintiffs later asked that the breach of contract and duty of fair representation claims be considered as "hybrid" claims.

The district court granted summary judgment to all defendants.  The court held it lacked subject matter jurisdiction over any breach of contract claim because the Board has sole authority to determine Union Pacific's contractual obligations in connection with the merger.  The court relatedly held that finding Union Pacific had a contractual obligation *not* to implement these changes would conflict with the Board's determination that these changes were "necessary" to implement the merger.  Having found no cognizable breach of contract claim, the

_____

[3]Plaintiffs contend that a retroactive date was used because it favored employees with less seniority, some of whom were also union officers.  Union Pacific maintains it used a retroactive date to avoid charges of manipulation it believed might arise if employees were able to change their line assignments *after* learning of the proposed changes.

court held there was no hybrid claim.

The district court also concluded that the duty of fair representation claims against both unions were barred by the statute of limitations. Alternatively it held that even if the limitation period governing the claims against the UTU had been equitably tolled, plaintiffs nevertheless failed to assert facts sufficient to allege a breach of the duty of fair representation by either union.

**II**

This court reviews the question of summary judgment de novo. *Jurasek v. Utah State Mem'l Hosp.*, 158 F.3d 506, 510 (10th Cir. 1998). Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). In applying this standard, we review the factual record and all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Id.* If no genuine issue of material fact exists, we determine whether the district court properly applied governing substantive law. *Id.*

Plaintiffs assert a hybrid claim. In a hybrid claim, a claimant alleges that his injury resulted from both his employer breaching a contract and his union

breaching its duty of fair representation. Thus to effectively assert a hybrid claim, a party must assert both a valid contract claim and a valid duty of fair representation claim. *See, e.g., Volkman v. United Transp. Union*, 73 F.3d 1047 (10th Cir. 1996). We therefore consider each in turn. As we discuss below, we conclude the district court lacks subject matter jurisdiction over the contract claims and, accordingly, plaintiffs also have not asserted a valid hybrid claim. We then separately consider plaintiffs' duty of fair representation claims, and conclude the district court was correct in granting summary judgment on these claims as well.

### *Breach of Contract*

Plaintiffs assert that the commitment letters to their unions from Union Pacific constituted a binding contract. The letters state the company will seek changes in connection with the merger only as necessary to effectuate it, and not solely to achieve cost savings. Plaintiffs further assert that because the seniority changes at issue here were not, in their view, "necessary," Union Pacific breached the contract by seeking and implementing the changes. Plaintiffs maintain the district court has jurisdiction to hear its breach of contract claims because the contract is not a collective bargaining agreement and is not subject to the New York Dock Conditions process imposed by the Board. Defendants contend, inter

-10-

alia, that the district court correctly ruled it lacked subject matter jurisdiction over the breach of contract claim because the Board has exclusive jurisdiction over railroad mergers.

The Board has broad statutory authority over railroad mergers. *See* 49 U.S.C. §§ 11321-26. This authority includes the power to alter contracts, including collective bargaining agreements, to the extent necessary to consummate a railroad merger subject to its approval. *See Norfolk & W. Ry. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, (1991) (interpreting 49 U.S.C. § 11321 to apply to collective bargaining agreements).

The Board has a statutory obligation to protect the interests of railroad employees involved in a merger. *See* 49 U.S.C. § 11326. To that end, the Board may specify which collective bargaining agreements or provisions of such agreements will govern during and after implementation of a merger. In those cases, employees who believe their employer has violated the terms of the governing employment contract may bring suit in district court to enforce it. *See, e.g., Volkman*, 73 F.3d 1047, 1049-51 (considering plaintiff's claim employer railroad breached collective bargaining agreement after merger).

As previously mentioned, the Board may also impose the terms of the New York Dock Conditions (NYDC), as it did here, to govern the resolution of disputes between a railroad and its employees that are *not* settled by existing

-11-

collective bargaining agreements, particularly disputes that arise over the implementation of mergers as they affect railroad employees. The NYDC require employers to compensate railroad employees who are displaced by Board-approved railroad transactions. NYDC Art. 1 §§ 5-9, 12. They also require the employer to notify its employees regarding any changes to operations it would like to carry out that would affect employees. If there is any dispute over the proposed changes, the parties are required to negotiate and, if necessary, arbitrate to determine whether the changes are necessary to effect the approved transaction and how such changes should be implemented. NYDC Art. 1 §§ 4, 11. Because the Board has authority to exempt transacting parties from any law as necessary to bring about the approved transaction, the NYDC remedies, in disputes to which they apply, effectively preempt other legal remedies. *See, e.g., Norfolk & Western Ry.*, 499 U.S. at 127-33 (Board merger conditions preempt Railway Labor Act and contract law); *Walsh v. United States*, 723 F.2d 570, 574 (7th Cir. 1983) (district courts lack subject matter jurisdiction over claims subject to NYDC arbitration).

Accordingly, the NYDC's arbitration provision is mandatory where it applies. *See Swonger*, 265 F.3d at 1139 (noting NYDC provides for mandatory arbitration). In this regard, we follow the other circuits that have considered the issue, all of which have construed the NYDC arbitration provision as mandatory.

-12-

*See Collins v. Burlington N. R.R.*, 867 F.2d 542, 544 (9th Cir. 1989) (per curiam);

*Atkins v. Louisville & Nashville R.R.*, 819 F.2d 644, 649 (6th Cir. 1987); *Hoffman*

*v. Missouri Pac. R.R.*, 806 F.2d 800, 801 (8th Cir. 1986); *Walsh*, 723 F.2d at 574.

Where the mandatory arbitration provisions of the NYDC apply, the district court

lacks subject matter jurisdiction over the same dispute. *See Walsh*, 723 F.2d at

574.

Because the Board imposed the NYDC on the merger in this case, the

mandatory arbitration provisions deprive the district court of jurisdiction as long

as the seniority changes at issue are not covered by any collective bargaining

agreement that continued in force after the merger. *See Collins*, 867 F.2d at 544.

Plaintiffs do not assert the existence of any such collective bargaining agreement;

in fact, plaintiffs deny the commitment letters signed by Union Pacific are

collective bargaining agreements. Rather, they contend the commitment letters

provide an alternative and superceding basis on which to find Union Pacific had

an obligation not to implement these changes.

We reject the argument that the commitment letters constitute a separate

obligation not to implement seniority changes. While these letters provide that

the railroad will not seek "unnecessary" changes, it is merely plaintiffs'

contention that these seniority changes are unnecessary and therefore violate the

terms of the letters. The issue of seniority changes was not expressly addressed

by the commitment letters and was instead an issue that arose with regard to the implementation of the merger. The seniority changes therefore constitute disputes to which the mandatory arbitration provisions of the NYDC apply. *See Hoffman*, 806 F.2d at 800-01 (holding the NYDC apply to claim by employee displaced under merger implementation agreement).

Plaintiffs also contend, apparently to avoid the exclusivity of the NYDC, that Union Pacific did not utilize the NYDC process in seeking to implement these changes. In their brief, plaintiffs contend the company unilaterally created the Denver and Salt Lake City hubs and corresponding seniority districts using a retroactive date without providing notice to the UTU and the BLE or presenting this plan to the arbitrator. As a general matter, the record plainly refutes this assertion. With respect to the BLE, the record reveals Union Pacific provided notice to the BLE, the parties negotiated implementation agreements for new hubs at Denver and Salt Lake City that changed seniority rights and specified a retroactive date for hub assignment, and the BLE members ratified these agreements. With respect to the UTU, the record demonstrates that the parties went through the NYDC process of notice, arbitration, and appeal to the Board. The substance of the agreements adopted by the arbitrator and upheld by the Board included the creation of the two consolidated seniority districts, changes in seniority rights for affected members, and the use of a retroactive date to

-14-

determine assignment to those districts. There is therefore no genuine issue of material fact as to whether Union Pacific followed the NYDC in creating consolidated seniority districts in Denver and Salt Lake City using retroactive dates.

Even if Union Pacific had not utilized the NYDC process, however, plaintiffs would still be bound by the NYDC's mandatory arbitration provisions. Our review of the record reveals that in one particular respect the company may have acted unilaterally rather than following the NYDC. Correspondence between UTU member-plaintiffs and UTU officials indicates that while these union members and officials were apparently aware Union Pacific intended to create two hubs and corresponding seniority districts, they were not aware that some Grand Junction employees, namely those on the west-running lines, would be assigned to the Salt Lake City hub rather than the Denver hub until this assignment was implemented on July 1, 1997. The implementation agreements adopted by the arbitrator are somewhat ambiguous with respect to this particular aspect of the changes implemented by Union Pacific. On one hand, the agreements provide Grand Junction is a dividing line between the two districts, which allows for the possibility that Grand Junction employees might go to both hubs, and the Salt Lake City agreement appears to list lines running west from Grand Junction as included in that new district. On the other hand, in the

Question and Answer summary appended to both agreements, question two asks, "Which Hub is Grand Junction in?" and the answer states, "For seniority purposes trainmen are in the Denver hub." Aplt. App. vol. II at 374. Thus one could argue that the assignment of Grand Junction employees to the Salt Lake City hub was not covered by the arbitrator's award and was therefore a change in working conditions for which Union Pacific did not provide notice as required under the NYDC. Even if we construe the dispute in this manner, however, it is still subject to mandatory arbitration under the NYDC because it relates to the application of a merger implementation agreement. Moreover, where the employer does not provide notice, a union or its members may invoke arbitration to determine whether the employer has changed employment conditions unilaterally and arbitrate the substance of the purported change. We emphasize employees may invoke arbitration without the participation or acquiescence of their representative union. *See Collins*, 867 F.2d at 544 (construing NYDC Art. 1 § 11(a)). Therefore, regardless of whether Union Pacific followed the NYDC in assigning employees on west-running Grand Junction lines to Salt Lake City, employees were themselves still bound to follow the NYDC by invoking arbitration to settle the dispute, as these are the mandatory remedies for this merger approved by the

-16-

Board.[4]

Because the NYDC provisions apply to this dispute, the district court correctly held that it lacked subject matter jurisdiction over the breach of contract claims based on this same dispute. Defendant Union Pacific was therefore entitled to summary judgment dismissing plaintiffs' breach of contract claims and, accordingly, their hybrid claims as well.

### Duty of Fair Representation

We must still consider whether defendant unions were entitled to summary judgment on plaintiffs' fair representation claims. Plaintiffs assert that their respective unions, the BLE and the UTU, violated the duty of fair representation by failing to sufficiently contest the seniority district changes, changes plaintiffs contend benefited some union members and officers at their expense.

The district court held the claims against both unions were barred by the statute of limitations. The court also determined that even if the limitations

---

[4] We also note that the NYDC provide plaintiffs with multiple individual forms of compensation for merger-related changes, including displacement allowances, dismissal allowances, separation allowances, fringe benefits and payments of certain types of expenses. Many of the plaintiffs have received monetary benefits pursuant to these provisions, and other individual claims appear to still be arbitrable under NYDC Article 1, Section 11. These remedies are in addition to plaintiffs' ability to arbitrate changes affecting union members even if their union chooses not to arbitrate such changes.

period governing the claims against the UTU had been equitably tolled, plaintiffs had nevertheless failed to allege facts in support of a duty of fair representation claim sufficient to survive summary judgment. We agree that the claims against the BLE are barred by the statute of limitations, and that plaintiffs have failed to assert sufficient facts in support of their claims against the UTU.

## 1.    *Brotherhood of Locomotive Engineers*

A six-month statute of limitations applies to duty of fair representation claims. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151 (1983). The BLE received notice of Union Pacific's proposed seniority changes in September 1996, and began negotiations with the company over these proposed changes in November 1996. Members opposed to the changes wrote to BLE leadership and urged it not to agree to them. In response, BLE leadership told concerned members that it did not plan to contest the seniority changes sought by Union Pacific because it feared losses on other issues. In January 1997, the BLE and the company reached two tentative agreements. These implementation agreements were finalized when union members ratified them on March 31. The changes went into effect on July 1, 1997. Plaintiffs filed duty of fair representation claims

against the BLE on November 18, 1998.[5]

Plaintiffs assert the BLE breached its duty of fair representation by failing to contest the seniority changes Union Pacific sought to implement and failing to assist employees who sought to file grievances protesting the changes, which plaintiffs contend impermissibly benefited the majority at the expense of a minority of employees. The district court held that the implementation date, July 1, 1997, was the accrual date for the claims, and that the claims were therefore barred by the limitations period. The court further concluded that plaintiffs had not alleged sufficient facts to state a duty of fair representation claim.[6]

We agree with the district court that these claims are untimely. The latest possible date the claims accrued is July 1, 1997, when the contested changes went into effect. *See Edwards v. Int'l Union, United Plant Guard Workers*, 46 F.3d 1047, 1053 (10th Cir. 1995) (fair representation claim accrues when claimant knew or should have known of allegedly unfair acts). Plaintiffs do not argue on appeal that the limitations period for these claims was tolled for any reason. Accordingly, because plaintiffs did not file these claims until more than one year

_____

[5]Plaintiffs filed suit on June 26, 1998, but they did not add the BLE as a defendant until November.

[6] With respect to one BLE plaintiff, Mr. Duncan, the district court held that although the limitations period for Mr. Duncan was tolled while he pursued a grievance, the limitations period began running on the date his appeal expired, May 12, 1998. Because Mr. Duncan's claim was not filed until more than six months later, the court concluded this claim was barred as well.

after the accrual date, they are barred by the statute of limitations.

## 2.    *United Transportation Union*

Plaintiffs allege the UTU breached its duty of fair representation by failing to contest seniority changes in arbitration before they went into effect, and by not trying hard enough thereafter to renegotiate or reverse the changes. As to the first allegation, the record plainly demonstrates to the contrary: although unsuccessful, the UTU did contest the seniority district changes during arbitration and appealed the arbitrator's determination to the Board.[7] Thus, no genuine factual dispute exists as to whether the UTU breached a duty of fair representation by failing to contest the seniority district changes in arbitration and on appeal, and plaintiffs have not stated a duty of fair representation claim in this regard.

With respect to plaintiffs' assertions that the UTU breached a duty to continue to negotiate with Union Pacific regarding seniority districts after arbitration and appeal, we are not persuaded plaintiffs have alleged facts

---

[7] To the extent that the assignment of some Grand Junction employees to the Salt Lake City hub might have reflected the company's interpretation of the arbitrator's award rather than the express substance of the award itself as we discussed *supra*, the UTU could not have been aware of this interpretation prior to its implementation, and therefore could not have opposed it in negotiations or in arbitration.

sufficient to support a fair representation claim. To show a breach of the duty of fair representation, plaintiffs must show that the union's actions were "'arbitrary, discriminatory, or in bad faith.'" *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 47 (1979) (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)). Plaintiffs support their claim primarily with the fact that the seniority changes benefited some UTU officers to the detriment of more senior employees, including these plaintiffs, asserting the union therefore engaged in arbitrary and discriminatory treatment. Other than this factual assertion, plaintiffs contend in essence that the UTU did not try hard enough to reverse the seniority changes after they were implemented on July 1, 1997. However, the record indicates the UTU entered a new round of negotiations with Union Pacific in September 1997, concluded new implementation agreements with the company in October 1997, and as late as December 1997 pursued discussions with the company regarding the possibility of reversing the assignment of some Grand Junction employees to the Salt Lake City hub. Plaintiffs have advanced no evidence other than the fact that the UTU was ultimately unsuccessful in reversing those changes to support a conclusion or an inference that these attempts were somehow superficial or nonexistent.

Even if the UTU's efforts were less than vigorous, under the circumstances here this fact is not sufficient to support a fair representation claim. As we set out above, the union had already attempted to prevent the seniority changes from

taking place by invoking arbitration and, after the arbitrator decided in the company's favor, appealing the arbitrator's award to the Board. It is true that the UTU did not appeal the Board decision to the United States Court of Appeals as it was entitled to do, but as it explained in a letter to members, an appeal had little chance of succeeding. Through these actions, the UTU certainly made sufficient efforts to defeat a claim that it did not adequately advocate the interests of its members with regard to seniority changes.

Similarly, the fact that the UTU consistently opposed the seniority district changes undermines plaintiffs' allegations that because the changes benefited certain union officers, the union's actions were discriminatory. The UTU's attempts to *prevent* the changes disprove the necessary premise of plaintiffs' allegation, that the UTU sought or acquiesced to, rather than opposed, the changes. Because we conclude plaintiffs have not advanced sufficient factual allegations to support their duty of fair representation claims against the UTU, we need not determine whether sufficient evidence was asserted to toll the six-month statute of limitations that would otherwise have run on these claims.

We **AFFIRM** the district court's grant of summary judgment to all defendants.